UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JENNIFER JUBINVILLE, *et al.*,           :
on behalf of themselves and all          :
others similarly situated,               :
          Plaintiffs,        :
                        :
        v.                      :    C.A. No. 19-74WES
                        :
HILL'S PET NUTRITION, INC.,              :
and HILL'S PET NUTRITION                 :
SALES, INC.,                             :
          Defendants.       :

## MEMORANDUM AND ORDER

Patricia A. Sullivan, United States Magistrate Judge.

This case is one of a series of putative class actions[1] arising out of a recall of "prescription" or specialty dog food that allegedly contained toxic and sometimes fatal levels of vitamin D; the recall was announced on January 31, 2019, by the manufacturer/seller of the dog food, Defendants Hill's Pet Nutrition, Inc., and Hill's Pet Nutrition Sales, Inc. (collectively, "Hill's"). On February 15, 2019, Plaintiffs Jennifer Jubinville, Jenna Sprengel, Kelli Coppi and Laura Freeman, individually and on behalf of all others similarly situated (collectively, "Plaintiffs"), filed this case.[2] ECF No. 1. Plaintiffs allege that the consumption of Hill's contaminated products inflicted significant suffering and death on their dogs and caused Plaintiffs to incur economic injury, including veterinary expenses. As of the date of the filing of the Jubinville complaint, the recall involved approximately 675,000 cases of canned food.

---

[1] Hill's has advised this Court of at least fifteen pending class action complaints arising from its recall of specialty dog food contaminated with excessive vitamin D. See ECF No. 14 at 17 n.5.

[2] Invoking the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et. seq.*, Plaintiffs assert the Court has subject matter jurisdiction based on 28 U.S.C. § 1331. Invoking the state law of various states, Plaintiffs also assert that the Court has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), and supplemental jurisdiction under 28 U.S.C. § 1367(a). ECF No. 1 at 3.

Plaintiffs assert that more specialty dog food contaminated with excessive vitamin D was sold by Hill's, beyond what has been recalled so far.

Prior to the recall, owners whose pets were suffering adverse symptoms after eating any type of Hill's "prescription" pet food initiated contact with Hill's by calling its consumer affairs line to speak to a representative, by emailing or by connecting with Hill's through social media. Consistent with its long-standing practice based on its "100% satisfaction guarantee," Hill's interviewed these consumers to get details of any health issues that the consumer linked to a Hill's product and, based on the submission of supporting documentation, offered reimbursement both to the consumer for related veterinary expenses and other costs and directly to the veterinarian for related diagnostic testing. After the recall was announced (and before any law suits had been filed), Hill's continued this practice, while ramping up the times when consumers could call due to the volume triggered by the recall. According to the protocol Hill's adopted based on its prior practice, consumers who initiated contact with Hill's would be offered reimbursement for recalled dog food they had purchased without being required to release any claims; Hill's also represented[3] that it would reimburse consumers for recall-related out-of-pocket veterinary expenses, as well as other costs associated with the recall, in consideration for a release of all claims. And Hill's continued its prior practice of reimbursing veterinarians directly for diagnostic testing of any dog whose owner was concerned that contaminated food might have been consumed.

In connection with this effort, Hill's developed communication protocols for the non-attorney consumer affairs representatives who fielded consumers' phone calls and a sequence of

---

[3] Events connected with the recall have unfolded so quickly that Hill's stated intent to provide full reimbursement for all veterinary costs and other expenses that can be traced to a recalled Hill's product is untested by actual experience.

written communications to be sent to consumers and veterinarians regarding reimbursement. After Hill's became aware that class actions were being filed, its letter to consumers offering reimbursement, in consideration for which Hill's required a release of claims, was edited to clearly advise the consumer that several class actions had been filed (including contact information for class counsel in each) and that the signing of a release would affect the consumer's right to participate in the class; both the letter and the release itself clearly emphasize that the consumer has the right to seek advice of legal counsel before signing.

Beginning in August 2018, one of the putative class representatives in this case, Jennifer Jubinville, initiated contact with Hill's repeatedly about her dog's health. After the recall was announced on January 31, 2019, Ms. Jubinville flooded Hill's with phone calls, emails and postings on Facebook; after this action was filed two weeks later (on February 15, 2019), she continued posting multiple times on Facebook. Three times Ms. Jubinville was successful in reaching and talking to Hill's non-attorney consumer affairs representatives. After she advised the Hill's representative that she wanted her bills of approximately $8,000 (primarily for veterinary expenses) to be reviewed for swift reimbursement, Hill's explained to her that it would send and then did (with her consent) send her its form letter and questionnaire detailing the information that it needed to review her claim. In addition, Hill's representatives called Ms. Jubinville twice in response to her inquiries,[4] leaving voicemail messages with its consumer affairs phone number for her to call if she wished.

Concerned by two responsive voicemails left by a Hill's representative on Ms. Jubinville's phone and by the letter and questionnaire Hill's sent to Ms. Jubinville, on March 4,

---

[4] Hill's credibly avers that it did not connect the "Jennifer Ann" who was posting on Facebook to the individual with whom representatives had already spoken at length and to whom its questionnaire had been sent. ECF No. 14-1, Kipers Decl. I ¶ 4.

3

2019, a little more than two weeks after the filing of the class action complaint, Plaintiffs filed

this emergency motion for a protective order.  The motion argues that Hill's communications

with Ms. Jubinville, a named putative class representative, are unethical, and that its

communications with other putative class members amount to impermissible discovery, are

unbalanced and misleading, and seek to adversely affect the status of this litigation.  The motion

seeks sweeping relief: to bar Hill's from communicating at all with consumers affected by the

recall except with a Court-approved script proposed by Plaintiffs; to void any releases consumers

have already signed; to cancel authority any consumers had given to allow Hill's to communicate

with a veterinarian; and to chide Hill's for what Plaintiffs claim is unethical conduct in violation

of Rule 4.2 of the Rhode Island Rules of Professional Conduct[5] in communicating directly with

Ms. Jubinville.  ECF No. 7.

Hill's opposes the motion, maintaining that its interactions with consumers have been

neither misleading nor coercive.  Hill's argues its communications do not warrant such an

extreme interference with its right to respond to consumers who contact it or the rights of

consumers to speak to its non-attorney representatives, including consumers' rights to seek quick

reimbursement without involving (and paying for) an attorney instead of the risky wait for the

outcome of a class action that may never be certified and may yield little or nothing.  And it

aggressively denies that its attorneys acted unethically by communicating with Ms. Jubinville,

pointing out that it was entirely appropriate for Hill's' non-attorney representatives to respond as

they did to Ms. Jubinville's repeated overtures.  ECF No. 14.

The motion is referred to me for determination pursuant to 28 U.S.C. § 636(b)(1)(A).

Based on the Court's review of the substance of Hill's communications so far with absent

---

[5] The applicable rule is cited as "R.I. Rule 4.2."

putative class members, the transcripts of the three calls with Ms. Jubinville and the arguments of counsel at the hearing held on March 18, 2019 (ECF No. 20, "Transcript Mar. 18, 2019"), the Court finds that, overall, Hill's communication strategy appears to be well calibrated to avoid misleading or improperly coercing consumers to sign releases that might pose a serious threat to the fairness of the litigation process.  Nevertheless, the Court is troubled that one of the letters (together with the attached questionnaire) Hill's has distributed, read in isolation, might be misleading in effect, ECF No. 14-4 ("Recall Letter" and "Questionnaire"), and orders a limited clarification of the meaning of Hill's deadline for consumers to submit documentation to support a claim for non-litigation reimbursement.  Otherwise, the subsequent letter in Hill's sequence of communications, as well as the release itself, is more than adequate to cure any potential misunderstandings.  ECF No. 14-6 ("Release Letter" and "Release").  As such, the Court finds that additional judicial interference with such communication treads perilously close to a serious interdiction on protected First Amendment speech.

As to Hill's' communications with Ms. Jubinville, the Court finds that none were unethical or violative of any Rhode Island Rule of Professional Responsibility.  Rather, they were all initiated by Ms. Jubinville, did not involve any attorneys and not only were appropriate but also were empathetically responsive to Ms. Jubinville's understandable anguish over the death of her dog.

Based on these findings and the analysis that follows, the Court grants Plaintiffs' motion in limited part to require clarification of the thirty-day deadline references in Hill's Recall Letter and the related Questionnaire; the balance of the motion is denied.

## I.   BACKGROUND[6]

---

[6] This background statement is drawn from the <u>Jubinville</u> complaint; the parties' representations during the hearing; the public record in connection with other recall-related class actions; Plaintiffs' motion and the accompanying

A.    **The Recall and Resulting Litigation**

On January 31, 2019, Hill's announced a voluntary recall of certain cans of dog food sold in late 2018 and early 2019.  Kipers Decl. II ¶ 4 & Ex. 1.  The specialty dog food subject to the recall had potentially elevated measurements of vitamin D, which can be seriously harmful to dogs.  Id.  While the recall announcement did not specify the number of cans affected, it provided a list of affected product names and accompanying product codes.  Id., Ex. 1 at 3-5.  Plaintiffs' complaint alleges Hill's has recalled 675,000 cases of dog food, which amounts to 13.5 million cans.  ECF No. 1 at 16.

The first recall-related class actions against Hill's were filed on February 11, 2019, in the Eastern District of New York and the Northern District of Florida, less than two weeks after the recall was announced.  Bone v. Hill's Pet Nutrition, 19-cv-831-LDH-RML, ECF No. 1; Russell v. Hill's Pet Nutrition, 19-cv-395-MCR-HTC, ECF No. 1.  Hill's was first served, with the Bone complaint, on February 13, 2019.  Bone v. Hill's Pet Nutrition, 19-cv-831-LDH-RML, ECF No. 10.  So far, cases are pending in the Central and Northern Districts of California, the Northern District of Florida, the District of Kansas, the Northern District of Illinois, the Eastern District of New York, the District of Rhode Island and the Eastern District of Tennessee.  In this Court, Jubinville was filed on February 15, 2019, and served on March 1, 2019.  ECF Nos. 1, 16.  Jubinville alleges a nationwide class, with subclasses in Rhode Island, Illinois, New York and Texas, of consumers "who purchased Hill's Prescription Diet and Science Diet dog food with elevated levels of vitamin D."  ECF No. 1 at 15.  A motion is currently pending before the Panel on Multidistrict Litigation to consolidate all of the Hill's recall-related class actions in a single

---

declaration (ECF No. 7-2 to 7-8, "Wexler Decl."); and Defendants' opposition and the accompanying declarations (ECF No. 14-1, "Kipers Decl. I"; ECF No. 14-2 to 14-6, "Kipers Decl. II"; and ECF No. 14-7 to 14-10, "Sommer Decl.").

transferee court.  The Panel will not hear the motion until May 2019.  Transcript Mar. 18, 2019, at 70.

**B.**     **Hill's Communications with Consumers**

Hill's publicized the recall with a January 31, 2019, press release posted by the U.S. Food and Drug Administration that urged consumers to contact their veterinarians if their pets showed symptoms of elevated vitamin D.  Kipers Decl. II ¶ 5.  Immediately following the recall announcement, Hill's was overwhelmed by pet owners who contacted it about the recalled dog food.  Id. ¶ 6.  In response, Hill's followed its previously-established procedure for processing consumer claims.  See id. ¶¶ 6-7, 11, 17.  That procedure included refunding or replacing recalled dog food, id. ¶ 7, paying veterinarians[7] for diagnostic testing and paying reimbursement of "medical and other expenses related to Vitamin D hypervitaminosis[,]" to either the veterinarian or pet owner.  Id. ¶ 11.  Hill's efforts to gather information about a particular consumer's claim for reimbursement were done in response to contact initiated by consumers who called, emailed, or posted on social media.  Id. ¶¶ 17-19.  Direct interaction with the consumer was conducted by Hill's consumer affairs representatives, who are not lawyers.  Id.

After an initial contact from a consumer seeking compensation, during days immediately following the recall announcement, Hill's sent its form letter with its standard claims-processing questionnaire – containing no content specifically relating to the recall – to gather information about the consumer's experience and documentation of the consumer's claim.  Id. ¶ 21; Wexler Decl. Ex. A.  This questionnaire asks, *inter alia*, about pet medical history and what food the pet ate in the past.  Id. at 4-6.  The letter clearly states, "[i]f you do not wish Hill's to conduct a review and to evaluate your claim for compensation, please disregard the balance of this letter."

---

[7] The content of Hill's communications with veterinarians is not at issue.

Id. at 2.  However, if the consumer does wish to seek compensation directly from Hill's, both the letter and the questionnaire state that Hill's requires the consumer to provide the information needed to evaluate the claim within thirty days from the date of the letter.  Id. at 2, 4.  Hill's sent 239 of these form letters and questionnaires between January 31 and February 8, 2019.  Kipers Decl. II ¶ 21.  During the period immediately after the recall and before Hill's was aware of any class actions, Hill's made one offer to settle, which was accepted through the signing of a release.[8]

### 1.   Recall Letter

Because it received "additional questions about the recalled food and the reimbursement process," Hill's developed the Recall Letter to explain more clearly its claims process.  Kipers Decl. II ¶ 23.  The Recall Letter consists of a recall-specific cover letter and a Questionnaire that is very similar to the standard questionnaire.[9]  The record does not clearly indicate the first day the Recall Letter was sent, but Hill's began mailing it out to consumers who had initiated contact to seek reimbursement no later than February 21, 2019, after Hill's was aware of at least one of the class actions.  Id.  As of March 14, 2019, Hill's estimated it had distributed 2,635 copies of the Recall Letter.  Id.

The Recall Letter opens by directly addressing the recall, stating Hill's is "sorry to hear that your pet may have been affected by the consumption of our recalled food."  Recall Letter at 2.  It states that it is being sent for the purpose of "explain[ing] our process to seek reimbursement for costs related to your pet's consumption of recalled food."  Id.  The Recall Letter clearly specifies what Hill's is prepared to offer:

---

[8] The record contains no suggestion that either this offer or the resulting release was misleading or coercive.

[9] The Questionnaire sent with the Recall Letter differs from the standard questionnaire only in that it has a section at the end explaining acceptable forms of proof of purchase.

> Hill's will reimburse you on a case-by-case basis for office visit costs, diagnostic testing, necessary treatments, and expenses that can be traced to a recalled Hill's food purchased between September 1, 2018 and January 31, 2019 in exchange for a release from you that says you will not sue or otherwise pursue an action against Hill's.

<u>Id.</u> at 3.  In order for Hill's to evaluate the consumer's claim for reimbursement, the Recall Letter explains that the consumer should supply it with the following: a copy of the pet's medical records; copies of veterinarian bills and documentation of other expenses, if applicable; and proof of purchase of the recalled food.  <u>Id.</u> at 2, 4-6.  For the same reason, the Recall Letter asks the pet owner to "giv[e] [Hill's] permission to contact [the] pet's veterinarian and obtain additional records if required."  <u>Id.</u> at 2.  This is re-emphasized at the end:

> **BY SIGNING THIS FORM, YOU AUTHORIZE HILL'S PET NUTRITION TO REVIEW YOUR CASE WITH YOUR VETERINARIAN AND OBTAIN MEDICAL RECORDS PERTAINING TO YOUR CASE.**

<u>Id.</u> at 6 (emphasis in original).  The Recall Letter does not include a proposed form of release nor does it make an offer to settle.  Rather, it sets out to "detail[] the claim process," including Hill's estimate that the processing of a claim will take approximately twelve weeks after the requested information is received.  <u>Id.</u> at 3.  Finally, Hill's advises that the requested information must be provided within thirty days of the date of the Recall Letter.  The introduction to the Questionnaire reiterates this advisory in peremptory language:

> **THE FOLLOWING STEPS MUST BE COMPLETED WITHIN 30 BUSINESS DAYS FROM THE DATE OF THIS LETTER.  FAILURE TO COMPLETE THESE STEPS WILL RESULT IN CLOSURE OF YOUR CASE.**

<u>Id.</u> at 2, 4.  Unlike the earlier version of the letter, the Recall Letter does not include the statement that the completion of the Questionnaire is only necessary if the consumer wants Hill's to review and evaluate her claim for reimbursement.

The Recall Letter does not mention the pending class actions nor does it state that consumers may consult an attorney.

### 2.    Release Letter and Release

After Hill's receives the pet owner's information and evaluates the claim, it next sends the Release Letter and Release.  Based on an analysis of the consumer's documentation, the Release Letter makes a formal offer of what Hill's will pay the consumer to resolve the claim, and it presents the Release that the customer must sign, indicating acceptance of the offer. Attached to the Release is an appendix listing detailed information regarding the pending class actions.  Because of the compressed time frame in which these events have unfolded, so far only one Release Letter (and Release) has been sent out, on March 11, 2019.  Kipers Decl. II ¶ 27.  As of the date of the hearing, this offer had not yet been accepted or rejected.

The Release Letter offers "a one-time only payment" in exchange for an agreement "not to sue Hill's in the future over the past purchase, use of, or any issue with any Hill's brand pet food."  Release Letter at 2.  It advises the consumer that, "[c]lass action complaints have been filed since the recall[,]" and that the consumer "may be eligible to participate in one of th[o]se lawsuits."  Id.  An eight-page appendix attached to the Release Letter catalogues the pending cases, along with names and contact information for the attorneys in each case and a brief description of the case status, claims and damages sought.  Id. at 6-13.  The Release Letter and the Release itself are clear that signing the Release "will affect [the consumer's] right to get a different sum of money or other relief from the litigation."  Id. at 3.  The Release Letter also requires those who sign it to keep its details confidential, at the same time that Hill's assures pet owners that, if they refuse to sign the release, it will not use any previously provided medical records in litigation unless there is court approval.  Id. at 3-4.  And it promises not to use the

consumer's answers to the questionnaires, except for impeachment.  Id. ("[I]f in the future you make statements under oath as part of a court proceeding that are inconsistent with your answers to the questionnaire, we will point out those differences in that proceeding.").  Finally, the Release Letter and the Release itself clearly encourage consumers to consult an attorney – "read the release carefully and do not hesitate to ask for the advice of an attorney or a tax professional if you have questions about it."  Id.; ECF No. 14-6 at 4 ("YOU MAY SEEK THE ADVICE OF COUNSEL, INCLUDING COUNSEL FOR THOSE LAWSUITS OR YOUR OWN COUNSEL, PRIOR TO SIGNING THIS RELEASE.") (emphasis in original).

> **C.**     **Ms. Jubinville's Contact with Hill's**

Hill's has submitted evidence establishing that, after an unrelated inquiry in 2015, Ms. Jubinville first contacted Hill's in August 2018 about her concern regarding her dog's reaction to Hill's dog food that has not been recalled.  Kipers Decl. I ¶ 6-7; Sommer Decl. ¶ 3 & Ex. A. Then, beginning on February 1, 2019, immediately after the recall was announced, Ms. Jubinville placed many calls to Hill's, posted numerous times on Hill's Facebook page and emailed Hill's repeatedly regarding the death of her much-loved dog after the pet consumed the recalled specialty dog food.  Kipers Decl. I ¶¶ 8-10.

In response to Ms. Jubinville's inquiries seeking reimbursement for her veterinarian bills, Hill's emailed her on February 4, 2019, asking that she call "so [Hill's] can appropriately respond to [her] inquiry."  Id. ¶ 11.  In some of her emails, Ms. Jubinville stated that she was seeking or had engaged an attorney to be reimbursed for the "vet bills."  Id. ¶ 10.  Whatever may be the accuracy of this statement, Ms. Jubinville also continued to post on Facebook.  In response to her barrage of inquiries, Hill's emailed Ms. Jubinville several times with its consumer affairs phone number and invited her to call if she wished to do so.  Id. ¶¶ 9, 11, 14.

Twice, Ms. Jubinville called; once on February 7 and again on February 8.  Transcripts of both calls are in the record.  Sommer Decl. ¶ 4 & Ex. B, C.

The first call was relatively short (approximately ten minutes) with a non-attorney consumer affairs representative.  Kipers Decl. I ¶ 16; Sommer Decl. ¶ 4 & Ex. B.  Ms. Jubinville explained that her dog had died from elevated levels of vitamin D after consuming Hill's recalled food, complained about her difficulties in getting through so she could speak to a Hill's representative, indicated her interest in reimbursement and mentioned that she had secured legal representation but might prefer to work directly with Hill's.  Sommer Decl. Ex. B at 2, 4 ("[S]o I ended up contacting an attorney when I wasn't able to get in touch with anyone, but before I paid him and you know went through with anything, I just wanted to get reimbursed for all the recent expenses that were unnecessary.").  Hill's representative listened and asked Ms. Jubinville to call back, which she did the next day.  In the second call, Ms. Jubinville raised the same topics. Kipers Decl. II ¶ 17; Sommer Decl. ¶ 4 & Ex. C.  This time, the conversation lasted for over an hour during which the Hill's non-attorney consumer affairs representative was empathetic and appropriate.  She told Ms. Jubinville that "[w]e do have a process in place for what you're asking."  Sommer Decl. Ex. C at 3.  During the conversation, the representative asked detailed questions about Ms. Jubinville's experiences and she responded at length.  Id. at 4-21.  At the end of the conversation, the Hill's representative told Ms. Jubinville that a form would be sent for her to provide detailed documentation of her claim for reimbursement to be evaluated by Hill's "vet bill review team"; Ms. Jubinville responded, "Okay."  Id. at 22.  On the same day, Hill's sent Ms. Jubinville its standard letter and questionnaire.  Kipers Decl. II ¶ 18 (referencing Wexler Decl. Ex. A).

After the calls with Hill's and after this class complaint naming her as the lead plaintiff was filed, Ms. Jubinville continued to post on Facebook.  Hill's responded to her posts on February 22 and 23, 2019, with two voicemails advising her of Hill's consumer affairs phone number.  Wexler Decl. Ex. D.  In leaving these two messages, Hill's did not realize that the person posting on Facebook was the same individual with whom it had already spoken or that she was the named class representative in Jubinville.  See *supra* n.4.

## II.    STANDARD OF REVIEW

Rule 23(d) of the Federal Rules of Civil Procedure provides the Court with "both the duty and broad authority" to regulate the communication of settlement offers to absent class members. Gulf Oil Co. v. Bernard, 452 U.S. 89, 99-100 (1981) (citing Fed. R. Civ. P. 23).  Nevertheless, as a baseline, "[b]efore a class is certified, counsel for both parties maintain a free-speech right to communicate with putative class members, *ex parte*, about the lawsuit – including a right to offer to settle." Kutzman v. Derrel's Mini Storage, Inc., 354 F. Supp. 3d 1149, 1153 (E.D. Cal. 2018); Nakamura v. Wells Fargo Bank, Nat'l Ass'n, Case No. 17-4029-DDC-GEB, 2018 WL 994706, at *4 n.5 (D. Kan. Feb. 21, 2018) (collecting cases).

The Court may step in and exercise its Fed. R. Civ. P. 23(d) authority when communications "have been found to be violative of the principles of Rule 23." Jones v. Jeld-Wen, Inc., 250 F.R.D. 554, 561 (S.D. Fla. 2008).  Examples include "communications that misrepresent the status or effect of the pending action, communications that coerce prospective class members into excluding themselves from the litigation, and communications that undermine cooperation with or confidence in class counsel." Id.; Nakamura, 2018 WL 994706, at *4 ("[A]busive communications are those that are false, misleading or confusing, contain material omissions, or are coercive or intimidating.").  It is "patently misleading" to "induce

putative class members into releasing claims without knowledge of the possibility of recovery through [ ] current litigation; it also does not afford putative class members a meaningful chance to evaluate the claims and their likelihood of success with counsel." Slamon v. Carrizo (Marcellus) LLC, 3:16-CV-2187, 2018 WL 3615989, at *3 (M.D. Pa. July 27, 2018). "An order under Gulf Oil 'does not require a finding of actual misconduct' – rather, '[t]he key is whether there is "potential interference" with the rights of the parties in a class action.'" Slavkov v. Fast Water Heater Partners I, LP, Case No. 14-cv-04324-JST, 2015 WL 6674575, at *2 (N.D. Cal. Nov. 2, 2015) (quoting O'Connor v. Uber Techs., Inc., No. C-13-3826 EMC, 2013 WL 6407583, at *4-5 (N.D. Cal. Dec. 6, 2013)). The movant bears the burden of making this showing. See Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc., 214 F.R.D. 696, 697-98 (S.D. Ala. 2003) ("[T]he movant must show that the particular form of communication at issue is abusive in that it threatens the proper functioning of the litigation."); Ashely v. Youngblood, Case No. 1:16-cv-01638 JLT, 2019 WL 415033, at *6 (E.D. Cal. Feb. 1, 2019).

If a court regulates communications in this context, its order "should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." Gulf Oil, 452 U.S. at 101. "Overly broad relief can violate the First Amendment." Nakamura, 2018 WL 994706, at *5. So "the resulting order must be carefully drawn so that it interferes with free speech as little as possible." Jones, 250 F.R.D. at 561. As factors that can "militate against" restricting communications, courts may consider whether the "settlement offers are comparable to damages putative class members would receive through th[e] class action[,]" and whether the class is "unlikely to be certified." Friedman v. Intervet Inc., 730 F. Supp. 2d 758, 762-66 (N.D. Ohio 2010). "Absent some showing of past

abuse, or of an intention of future abuse[,]" courts do not get involved.  Patel v. 7-Eleven, Inc., 322 F. Supp. 3d 244, 251 (D. Mass. 2018) (alteration omitted).

When assessing whether a communication is abusive, "the standard is one requiring the facts to be examined in totality[.]"  Kutzman, 354 F. Supp. 3d at 1158; see Talavera v. Leprino Foods Co., Case No. 1:15-cv-105-AWI-BAM, 2016 WL 880550, at *5 (E.D. Cal. Mar. 8, 2016) ("Whether a communication is misleading or coercive – and therefore warrants judicial intervention – often depends not on one particular assertion, but rather the overall message or impression left by the communication."); Bobryk v. Durand Glass Mfg. Co., Civil No. 12-cv-5360 (NLH/JS), 2013 WL 5574504, at *5-6 (D.N.J. Oct. 9, 2013) (noting "the absence of a bright-line rule controlling pre-certification communications" requires courts to assess "whether the factual circumstances surrounding *ex parte* communications" warrants judicial intervention); see also Jones, 250 F.R.D. at 563 (analyzing potentially misleading paragraph as "read from the standpoint of a neutral third person").  "[I]ntent is not conclusive of the Court's determination" in this inquiry.  Jones, 250 F.R.D. at 562.

In cases where there is pending litigation and a litigant has a claims review process, the claims process generally may move forward, but it must comply with Fed. R. Civ. P. 23(d).  In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010, No. MDL NO. 2179, 2011 WL 323866, at *7 (E.D. La. Feb. 2, 2011) (noting how the nature of the claims process can lead "to confusion and misunderstanding by claimants, especially those who are unrepresented by their own counsel" and ordering defendant to begin any communication with a putative class member with a statement that the individual has a right to consult an attorney before accepting settlement); see Cheverez v. Plains all Am. Pipeline, LP, Case No. CV15-4113 PSG (JEMx), 2016 WL 861107, at *6 (C.D. Cal. Mar. 3, 2016) (analyzing

defendant's "claims process" and finding "Defendants' efforts to continue resolving claims will not be frustrated because Defendants are not prohibited from contacting putative class members altogether.  Defendants are only prohibited from doing so in a way which is misleading.").

It is not proper to misrepresent deadlines when communicating settlement offers.  <u>See</u> <u>Keystone Tobacco Co. v. U.S. Tobacco Co.</u>, 238 F. Supp. 2d 151, 159 (D.D.C. 2002) (finding communications "were improper because they misrepresented basic facts as to the settlement agreement and relevant deadlines," and ordering "narrow limitations" to ensure "representatives do not mislead putative class members or act in a coercive or threatening manner while proposing settlement").  However, if, "within a reasonable time after learning of a misleading communication," a party makes efforts "to prevent the communication from discouraging participation among . . . potential class members[,]" that may sufficiently "remedy the potential harm caused by the initial communication."  <u>Davine v. Golub Corp.</u>, Civil Action No. 14-30136-MGM, 2014 WL 5427006, at *5 (D. Mass. Oct. 24, 2014).

## III.    ANALYSIS

### A.    <u>Recall Letter's Thirty-Day Deadline is Misleading</u>

At the outset, it is important to note that the Court finds this record shows that Hill's has acted diligently and with good faith in response to the recall and ensuing litigation.  But that does not control the Court's analysis because "intent is not conclusive."  <u>Jones</u>, 250 F.R.D. at 562. Rather, the Court must view the totality of the effect of the communications.  <u>See</u> <u>Kutzman</u>, 354 F. Supp. 3d at 1158.  That analysis begins with Hill's Recall Letter and Questionnaire, which precede the Release Letter and Release in Hill's communication sequence.

The Court finds one troubling problem with Hill's Recall Letter and related Questionnaire.  Because they do not mention the existence of the pending cases and do not

mention that consumers may consult an attorney, but do advise that the consumer's failure to supply all of the information and documentation requested in the questionnaire "within 30 business days . . . will result in closure of your case,"[10] they create the risk that a consumer would be misled into believing that the failure to return the completed questionnaire in thirty days eviscerates any possibility of recovery.[11]  The potential for confusion is exacerbated because Hill's phrase – "closure of your case" – is susceptible to conflating the closing of Hill's claim file with extinguishment of the legal claim.  See Jones, 250 F.R.D. at 563 (communication should be examined "from the standpoint of a neutral third person").  A consumer so misled who is unable to complete the questionnaire in thirty days might discard the relevant documentation and give up, losing forever her opportunity to recover as a class member.  A consumer so misled might struggle to complete the form quickly, unaware that his claim is not extinguished in thirty days, in that litigation remains available as an alternative (albeit slower and perhaps riskier) route to potential reimbursement.  A consumer so misled might reluctantly decide to give her documentation to Hill's and authorize Hill's to communicate with her veterinarian, unaware that another option may be available.  With no mention of the existence of the pending class lawsuits and no suggestion that the consumer may proceed more slowly and confer with counsel about a potential claim, the mischief potentially wrought by the reference to a thirty-day deadline with

---

[10] At the hearing, Hill's counsel conceded that, contrary to the language of the Recall Letter, this deadline is not applied literally in that Hill's will continue to work with consumers after the thirty days have passed.  Transcript Mar. 18, 2019.

[11] Significantly, the Recall Letter lacks the sentence in the pre-class action letter, which advised consumers that the completion of the questionnaire within thirty days was only required if the consumer wished his claim to be reviewed and evaluated by Hill's for possible compensation.  Accordingly, while the earlier letter also has a thirty-day deadline, the Court does not find it to be misleading in that the letter was otherwise clear that the deadline applied only to Hill's claims process.  In any event, no class actions were pending during the period when Hill's sent the earlier letter.  Therefore, it is questionable whether the Gulf Oil authority of courts emanating from Fed. R. Civ. P. 23(d) to regulate communication of settlement offers to absent class members is applicable.

no clarification that it applies only to Hill's claims process has a potentially adverse impact on the rights of absent putative class members.

In evaluating the Recall Letter and Questionnaire, the Court need not conclude there was "actual misconduct"; instead it must ask "whether there is 'potential interference' with the rights of the parties in a class action." Slavkov, 2015 WL 6674575, at *2 (citing O'Connor); see Kutzman, 354 F. Supp. 3d at 1156 (citing Slavkov).  That standard is met here: the Recall Letter and Questionnaire leave the pet owner likely to think that failing to submit information in connection with the Hill's claims process within thirty days relinquishes the right to file suit, all while omitting any information about pending litigation and the notion of consulting counsel. See Keystone Tobacco, 238 F. Supp. 2d at 159.  To cure this deficiency, the Court orders that Hill's must craft a corrective communication to be incorporated into the Recall Letter going forward and to be sent to consumers who received the Recall Letter so far.  The corrective communication must advise that the thirty-day deadline is just Hill's claims processing deadline; that Hill's deadline for claims processing has no impact on the time by which a case asserting a claim must be filed in court, which is based on whatever may be the applicable statute of limitations; and that consumers who decide not to make a claim pursuant to Hill's claims process should confer with an attorney to ascertain what the applicable statute of limitations may be. Finally, to the extent that Hill's is actually applying its thirty-day deadline flexibly, it must also cure the misstatement at the head of its questionnaire, which indicates that the deadline is rigid.

### B.    Release Letter and Release Are Largely, But Not Entirely, Curative

Unlike the Recall Letter and Questionnaire, the Release Letter and Release provide the pet owner with a fulsome description of pending litigation and the opportunity to consult an attorney, all of which the consumer sees before signing anything that might result in the

relinquishment of a claim.  In plain terms, it indicates that cases exist, and it lists them and provides case-related details, including contact information of plaintiff-side counsel.  There is also straightforward language encouraging recipients of the letter to seek legal advice.  "These facts demonstrate an effort to provide a plain-language, neutral account of the claims, [Hill's] adverse position, its offer to settle, and a place where the [pet owners] could get the other side of the story – from Plaintiffs' counsel."  Kutzman, 354 F. Supp. 3d at 1156.  Thus, it is more than adequate to meet the concerns that have animated court orders based on Fed. R. Civ. P. 23(d). See, e.g., Marino v. CACafe, Inc., Case No. 16-cv-6291 YGR, 2017 WL 1540717, at *2-3 (N.D. Cal. Apr. 28, 2017) (finding "deceptive omissions" where "communications did not inform putative class members that there was a lawsuit pending that concerned their legal rights, the nature of the claims, plaintiff's counsel's contact information, the status of the case, or any other information that might have permitted them to allow them to make an informed decision about the waiver of their rights"); Friedman, 730 F. Supp. 2d at 763 (abusive to procure settlements from absent class members without disclosing ongoing litigation).  Except for consumers deterred by the confusion caused by the thirty-day deadline who never return the Questionnaire (and therefore never get the Release Letter), the Release Letter and the Release are more than sufficient to "remedy the potential harm caused by the initial communication" in failing to mention the pending class actions and failing to advise of the right to confer with counsel. Davine, 2014 WL 5427006, at *5.  Weighing the curative potential of the Release Letter aligns with "the standard . . . requiring the facts to be examined in totality."  Kutzman, 354 F. Supp. 3d at 1158.  This approach is consistent with the Court's duty to "carefully draw[ the Order] so that it interferes with free speech as little as possible."  Jones, 250 F.R.D. at 561.  A hands-off approach is particularly apt in a case like this, where Hill's settlement offers appear to be

comparable to the putative class members' likely eventual damages and where Plaintiffs face a

"steep hill . . . to establish certification" in "putative products liability class action regarding

harm to pets."[12]  Friedman, 730 F. Supp. 2d at 765 (citing Ikonen v. Hartz Mountain Corp., 122

F.R.D. 258, 262-63 (S.D. Cal. 1988)).

    The bottom line is that Plaintiffs fall well short of presenting "a clear record" that the

Release Letter or the Release justify "specific findings" limiting Hill's First Amendment right to

communicate settlement offers.  Gulf Oil, 452 U.S. at 101.  With the clarification of the Recall

Letter discussed above, Hill's may move forward with its claims processing and "continue

resolving claims" because it is "only prohibited from doing so in a way which is misleading."

See Cheverez, 2016 WL 861107, at *6.

### C.    Hill's Has Not Engaged in Impermissible Discovery

    Hill's has not impermissibly gathered discovery from absent putative class members.

The principle Plaintiffs rely on – discovery from absent class members is generally not permitted

– applies after the class has been certified to avoid discovery that "may defeat the purpose of

certifying the class in the first place."  See, e.g., McPhail v. First Command Fin. Planning, Inc.,

251 F.R.D. 514, 517 (S.D. Cal. 2008).  With class certification in this case not even on the

horizon, Hill's communications simply do not constitute "discovery from absent members of a

---

[12] This is not a circumstance where consumers clearly will be better served by an order interfering with their ability to accept Hill's offer for immediate and certain reimbursement.  The opposite may be true in that the alternative path (class litigation) involves not only significant delay, but also the significant risk that this class may never be certified.  See Friedman, 730 F. Supp. 2d at 765.  And Hill's settlement offers may well be comparable or equal to what Plaintiffs' ultimate damage award in a class case would be – Hill's has shown a willingness to cover all economic damages related to the recalled product and there is a serious risk that class members may not be able to recover more in that many states do not allow damages for emotional distress caused by the death of a pet.  See Soto v. United States, 63 F. App'x 197, 199 (6th Cir. 2003); Entelisano v. Electrolux Home Prod., Inc., No. 6:10-CV-1074, 2011 WL 572434, at *3 (N.D.N.Y. Feb. 15, 2011).  Indeed, at the fairness hearing in a recent class-wide settlement of a pet food recall case in New Jersey, the recovery negotiated for the class by class counsel consisted of documented economic damages with nothing for emotional distress, essentially what Hill's is already offering to pay without delay or the need to engage counsel.  In re Pet Food Prods. Liab. Litig., Civil Action No. 07-2867 (NLH), 2008 WL 4937632, at *10 (D.N.J. Nov. 18, 2008), affirmed in relevant part, 629 F3d 333 (3d Cir. 2010).

certified class." In re Plasma-Derivative Protein Therapies Antitrust Litig., No. 09 C 7666, 2012 WL 1533221, at *5 (N.D. Ill. Apr. 27, 2012) (rejecting same argument as applied to "putative but as-yet *uncertified* class") (emphasis in original). And, pre-certification, courts readily recognize that "[b]oth parties need to be able to communicate with putative class members – if only to engage in discovery regarding issues relevant to class certification – from the earliest stages of class litigation." Austen v. Catterton Partners V, LP, 831 F. Supp. 2d 559, 567 (D. Conn. 2011); see Hernandez v. Best Buy Stores, L.P., No. 13cv2587-JM KSC, 2015 WL 7176352, at *6 (S.D. Cal. Nov. 13, 2015) (same); Mendez v. Enecon Ne. Applied Polymer Sys., Inc., No. CV 14-6736(ADS)(AKT), 2015 WL 4249219, at *2 (E.D.N.Y. July 13, 2015) (same).

### D.    **Hill's Attorneys Have Not Committed an Ethical Violation**

For two simple reasons, the Court rejects Plaintiffs' claim that Hill's counsel breached any ethical rule, including R.I. Rule 4.2. First, R.I. Rule 4.2 is specific – its terms prohibit only lawyers from knowingly communicating with an opposing party represented by counsel. See id. (unless exceptions are met, "a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter"). The commentary to the Rule confirms this. See, e.g., id. comment [1]. Hill's attorneys did not communicate at all with Ms. Jubinville; nor is there a whisper of a suggestion that Hill's attorneys directed Hill's consumer affairs representatives to leave voicemail messages for a person they knew to be a named class representative in this case. Accordingly, R.I. Rule 4.2 is not applicable. Second, although Plaintiffs invoked R.I. Rule 4.2, they have failed to provide a developed argument.[13] Their request for relief on an alleged violation of R.I. Rule 4.2

---

[13] There seems a ready explanation for Plaintiffs' apparent abandonment of this argument: Plaintiffs' counsel were unaware of the totality of the circumstances of Ms. Jubinville's repeated efforts to get Hill's to talk to her until Hill's filed its response to the motion. After that, Plaintiffs backed away from their ethical critique of Hill's attorneys' conduct and did not press the argument further.

is also rejected on that basis.  See Vargas-Colon v. Fundacion Damas, Inc., 864 F.3d 14, 24 (1st Cir. 2017) (argument not developed in brief need not be considered).

## IV.     CONCLUSION

Based on the foregoing, the Court grants in part Plaintiffs' motion (ECF No. 7) for a protective order governing communications between Defendants and putative class members, as follows:

    (1) Defendants shall craft a corrective communication to be incorporated into the Recall Letter going forward and to be sent to consumers who received the Recall Letter advising that the thirty-day deadline referenced in the Recall Letter and the enclosed questionnaire is Hill's claims processing deadline; that Hill's deadline for claims processing has no impact on the time by which a case asserting a claim must be filed in court, which is subject to a different deadline based on whatever the applicable statute of limitations may be; and that consumers who wish to ascertain what the applicable statute of limitations may be should confer with an attorney.

    (2) To the extent that Defendants are actually applying the thirty-day deadline flexibly, the corrective communication must also cure any misstatement that indicates otherwise.

    (3) The corrective communication shall be sent within ten days of the entry of this Order.

Otherwise, the motion is denied.

So ordered.

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
April 12, 2019